

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00306-CV

_____

IN THE INTEREST OF R.S., A CHILD

---

On Appeal from the 16th District Court
Denton County, Texas
Trial Court No. 21-1653-16

---

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Father R.S. appeals the termination of his parental rights to his daughter Rachel.[1] He raises three issues:

(1) Whether the trial court violated Father's due-process rights by proceeding with his termination trial despite his having been declared incompetent to stand trial in his companion criminal case.

(2) Whether the trial court erred by denying Father's motion for continuance.

(3) Whether the trial court erred by denying Father's motion for new trial.

We hold that Father's due-process rights were not violated and that the trial court did not err by denying Father's motion for continuance and motion for new trial. Thus, we overrule Father's three issues and affirm the trial court's judgment.

## I. The Removal

The Texas Department of Family and Protective Services filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent–Child Relationship" on March 4, 2021. In the removal affidavit, Maegan Self, a Department investigator, wrote that on March 3, the Department had learned that Mother had been found dead in her home from an apparent homicide, the police suspected that Father had murdered Mother, and law enforcement had not been able to locate either Father or ten-year-old Rachel. After an Amber alert, the

---

[1]We use an alias to identify the child, and we identify family members by their relationship to the child. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

police located Father and Rachel together. The police took Father in for questioning and, later, arrested him for Mother's murder, and an FBI Child Abduction Recovery Team transported Rachel to a Children's Advocacy Center to be interviewed.

During the interview, Rachel related that Father had told her that he was protecting her from Mother because Mother had wanted to sell Rachel. Father reassured Rachel by telling her that he had sent Mother to Mexico. From Rachel's comments, Self deduced that Rachel was not yet aware that Mother was dead.

After the interview, Self and a Children's Advocacy Center therapist broke the news to Rachel. Based on Rachel's response, Self took Rachel to a hospital for a mental assessment and recommended admitting Rachel to a mental-health facility.

The medical staff at the hospital feared that Rachel might harm herself and counseled inpatient care. Although the Department had considered family placements, it opted to address Rachel's mental-health concerns first and, thus, requested being appointed Rachel's temporary managing conservator.

That same day, the trial court signed an emergency order naming the Department as Rachel's temporary managing conservator.

## II. Dismissal Deadline Extended

Eleven months later, in February 2022, Father moved to continue his trial and to extend the dismissal deadline. *See* Tex. Fam. Code Ann. § 263.401(b). Father averred that in his criminal proceeding, he had been found incompetent to stand trial and was awaiting transport to a state hospital for treatment. The trial court granted

3

Father's motion, extended the dismissal deadline to August 22, 2022, and set Father's termination case for trial on July 18, 2022.

### III. The Trial

### A. Motion for Continuance Denied

On the morning of trial, Father filed a written motion for another continuance. His status had not changed; he was still awaiting transport to a state hospital for competency treatment. After an evidentiary hearing during which transport deputies testified that Father had refused to leave his cell and attend the trial, the trial court denied Father's motion and proceeded to trial without him.

### B. Detective Harding

Michael Harding, a patrol sergeant with the Carrollton Police Department, had been a detective on March 3, 2021, when he investigated Mother's death and encountered Father. Mother had been found asphyxiated on the living room floor of her apartment.

Through his investigation, Harding determined that after Mother had failed to pick Rachel up from school, Rachel went to a friend's house. Father picked Rachel up from there, took her to eat, and then dropped her off back at the friend's house. Later that evening, driving Mother's car, Father again picked Rachel up and drove to Red Oak, where—thanks to an Amber alert—the police eventually located him and Rachel in a hotel. Father had Mother's passport, Mother's bank card, and Mother's cell phone.

4

After Harding read Father his *Miranda*[2] rights, Father admitted having been in Mother's apartment. Father explained that they discussed Mother's alleged plan to take Rachel to Mexico and sell her there. When Harding asked Father why he thought Mother wanted to do that, Father responded that he just had a "gut feeling," almost like it was a premonition. Father called Mother "a stupid bitch" and admitted slapping her and spitting in her face. According to Father, Mother fell to the ground after being slapped, but she got back up, so he grabbed her and threw her to the ground a second time. Father denied killing Mother.

But according to Harding, who had gone to the crime scene, physical evidence identified Father as Mother's killer. In addition to being asphyxiated, Mother "definitely had been assaulted" and had a unique mini-chevron pattern on her nose and upper lip that matched the soles of Father's shoes. The police suspected that the bottom of Father's shoes had blood on them, so they tested his shoes using luminescence, and the results came back positive for blood.

Harding testified that he found Father's concerns about Mother's selling Rachel in Mexico strange at the time. But when asked if he thought Father had a mental illness, Harding answered, "No." Harding explained that throughout the interview, Father "was able to answer our questions very coherently. He understood everything

---

[2]*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966) ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.").

that we were saying. And he was able to . . . respond appropriately." Harding ultimately determined that Father was the perpetrator.

## C. Investigator Self

Self became involved in Rachel's case on March 3 when she heard about the Amber alert for Rachel, about Mother's death, and about Father's possibly being responsible for Rachel's absence. The FBI recovery unit brought Rachel to the Children's Advocacy Center that same day, and Self observed Rachel's interview. Initially Rachel was confused about what was going on, but after Self and a counselor informed Rachel of Mother's death and Father's arrest, Rachel asked, "[A]re you sure this was my mom? Are you sure this is my dad?" and became distraught. "[S]he shook a lot, and then she cried." From the Children's Advocacy Center, Rachel was transported to a hospital because she had stated that she felt suicidal and had commented that she wanted to harm herself.

The Department initially considered placing Rachel with Paternal Grandmother, but the Department did not approve that placement due to safety concerns. Rachel identified Paternal Uncle as a possibility; the Department approved Paternal Uncle and ultimately placed Rachel with him and his family.

Self met Father at the jail on March 4. She provided him with paperwork regarding the removal and gathered his social history and background information. When the subject of the murder allegations came up, "he called [Mother] vulgar names. And ultimately, he said that he didn't kill her, but that he did slap her in the

6

face and spit on her, and that he wasn't sorry that she was dead." Father elaborated that Mother was trying to sell Rachel in Mexico, that he had told Rachel that Mother was trying to sell her, and that one of his brothers could adopt Rachel. When asked to describe Father, Self responded, "He seemed agitated. He was not sorry or sad about [Mother's] death. And he continued to speak about her in very derogatory names." Self added, "It was shocking. She was newly deceased, and he was calling her very vulgar names and talking in a derogatory manner."

## D. Special Investigator Erler

Fred Erler was a special investigator for the Department. Self asked him and another special investigator to interview Father to get "more details as to what happened." Erler interviewed Father on March 5. Father identified his brothers as possible placements for Rachel. When the subject of Mother's death came up, "[Father] . . . used vulgar language regarding [her]. He admitted that he slapped her. He stated that he slapped her real hard, and then she stood up, and he slapped her again" and "spit in her face." Father said that he went to see Mother because he was concerned that she was going to sell Rachel. But Father never admitted killing Mother. When asked to describe Father, Erler responded, "Coherent. He was coherent. He answered my questions." Erler did not believe that Father had any mental-health issues. Regarding Rachel, Erler said, "[Father] didn't say a whole lot about her other than he felt like he was the only one that could protect her. He said that she was his whole world, I believe." Although Erler agreed that Father appeared

7

to love Rachel and to be protective of her, Erler did not think that Father's picking up Rachel after murdering Mother and then absconding with Rachel was protective.

### E. Sergeant Shelton of the Denton County Jail

Sergeant Andrew Shelton of the Denton County Sheriff's Office was in charge of all the inmates and officers in the Denton County jail. He testified that Father was housed in a single cell in the main jail. Shelton explained the significance of being housed in a single cell:

> Mainly when inmates come in, they're usually housed in the general population. Their behavior dictates where they're housed after that. A lot of times inmates in a single cell cannot get along with others or are a danger to staff. So therefore, we minimize contact to protect both them and other inmates and staff in the jail.

When asked to describe the behavior that would lead to housing an inmate in a single cell, Shelton responded, "Multiple fights, threats towards staff, throwing feces or spitting on officers, fighting officers, getting in fights with other inmates." Father had exhibited that behavior multiple times, with Shelton estimating the number of incidents at around fifty.

When asked to describe Father's behavior day to day, Shelton answered that Father was "very vulgar. Very disrespectful. The majority of our interactions are him cursing at us, threatening to kill us and our families" unless Father needed something, in which case he would have a "somewhat normal conversation." Father's compliance with orders "varie[d]."

According to Shelton, Father posed a constant threat of injury to both himself and the officers:

> I worry about him a lot because he's a very dangerous inmate. He's a very vulgar inmate. He has spit and thrown feces on officers. Anytime we have to go in his cell, it's a chance of him hurting one of my officers, or even him getting hurt in the process of us trying to restrain him.

Shelton would not allow Father around other inmates because Father had been in fights.

Shelton was aware that Father was waiting to go to a mental hospital but did not know why: "I don't know what he's been diagnosed with. I think he struggles from something. I don't know what that is." Shelton also knew that the wait for going to the mental hospital was long.

## F. Conservatorship Worker Rivera

Krystal Rivera worked for the Department as a conservatorship worker and had been assigned to Father and Rachel's case. Father had not completed any services. According to Rivera, Father might have to wait two years before being sent to the mental hospital. Rivera testified,

> Right now [Rachel] deserves permanency with everything that happened. [Father], as we've heard, is not in the best state. And, you know, if we're looking at two years for him to go into the mental hospital and that is just to regain competency, who knows how long [before] his criminal trial is going to happen.
>
> And [Rachel] could very well be 18 by the time there's any kind of resolution -- or further than 18. [Rachel] deserves to be stable in a placement and not be concerned of the unknown of what is going to

9

happen with her the next day, if she's going to be able to stay here forever.

At the time of trial, Rachel was twelve years old.

Rivera said that Rachel had been placed with Paternal Uncle and his family. If Father's parental rights were terminated, Paternal Uncle and his wife were open to adopting Rachel. Rachel had indicated that she wanted them to adopt her, and Rivera testified that Rachel "loves them very much," "gets along really well with her cousins," and was concerned that Father would take her and disrupt her placement. Father himself had expressed to Rivera that he supported placing Rachel with Paternal Uncle. Parental Uncle and his wife were meeting Rachel's needs.

According to Rivera, Rachel was still dealing with the aftermath of March 3 and was receiving therapy regarding Mother's death. She was also receiving medications to address anxiety and depression.

Regarding termination, the Department asserted that Father (1) had knowingly placed or knowingly allowed Rachel to remain in conditions or surroundings that had endangered her physical or emotional wellbeing, (2) had engaged in conduct or knowingly placed Rachel with persons who had engaged in conduct that had endangered her physical or emotional wellbeing, and (3) failed to comply with court-ordered provisions establishing what he had to do before the court would consider returning Rachel to him. The Department believed that terminating Father's parental rights and continuing her placement with Paternal Uncle was in Rachel's best interest.

10

## G. CASA Program Director Fry

Cheri Fry was the program director for CASA,[3] and she typically supervised the status of cases assigned to CASA. For Rachel and Father's case, Fry said, "CASA would recommend the father's rights be terminated and that [Rachel] be adopted by her aunt and uncle."

## H. Father's Exhibits

Father's criminal-defense attorney had filed a petition for writ of habeas corpus that was admitted as an exhibit. In the petition, defense counsel asked that Father be transferred to a mental-health facility immediately for treatment. Also admitted was Dr. Kelly Goodness's competency evaluation in which Dr. Goodness stated that Father appeared "to have a severe mental illness" and was incompetent to stand trial.

## IV. Father's Issues

## A. Due Process

In Father's first issue, he contends that his due-process rights were violated because his termination trial proceeded despite his having been declared incompetent to stand trial in his companion criminal case. We disagree.

The Texas Family Code does not make competency a prerequisite to proceeding to trial. *In re R.M.T.*, 352 S.W.3d 12, 18 (Tex. App.—Texarkana 2011, no

---

[3]CASA is an acronym for Court Appointed Special Advocates. *In re S.G.*, No. 02-21-00371-CV, 2022 WL 1112385, at *4 n.5 (Tex. App.—Fort Worth Apr. 14, 2022, no pet.) (mem. op.).

pet.); *In re E.L.T.*, 93 S.W.3d 372, 375 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Indeed, the Texas Family Code recognizes that an extended mental or emotional illness or a mental deficiency justifies terminating parental rights. *See* Tex. Fam. Code Ann. § 161.003(a); *R.M.T.*, 352 S.W.3d at 18; *E.L.T.*, 93 S.W.3d at 375. This provision would be moot if a parent's incompetency prevented the Department from proceeding to trial. Moreover, courts presume that the procedural rules comply with constitutional due-process requirements. *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).

### 1. Applicable Law

Procedural due process requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976); *R.M.T.*, 352 S.W.3d at 17. But "what process is due in any given situation is measured by a flexible standard that depends on the practical requirements of the circumstances." *R.M.T.*, 352 S.W.3d at 17; *see Mathews*, 424 U.S. at 349, 96 S. Ct. at 909.

The Supreme Court has provided a framework for courts to evaluate claims of procedural-due-process deprivation. *Mathews*, 424 U.S. at 335, 96 S. Ct. at 903. Courts must balance three factors: (1) the private interests that will be affected by the official action; (2) the government's interest; and (3) the risk of an erroneous deprivation of parental rights through the procedures used. *Id.*, 96 S. Ct. at 903; *In re J.P.-L.*, 592 S.W.3d 559, 575 (Tex. App.—Fort Worth 2019, pet. denied) (citing *Mathews*,

12

424 U.S. at 335, 96 S. Ct. at 903); *In re G.C.*, 66 S.W.3d 517, 525 (Tex. App.—Fort Worth 2002, no pet.).

### 2. Discussion

#### a. Private Interests

Parents' interest in maintaining custody of and raising their children is paramount. *M.S.*, 115 S.W.3d at 547. A child's emotional and physical interests are a private interest that courts should consider under *Mathews*'s first prong. *See id.* ("The child bears a substantial interest in the proceedings as well."); *R.M.T.*, 352 S.W.3d at 20. Rachel had a strong interest in a final termination decision so that she could achieve permanency and avoid remaining in legal limbo. *See R.M.T.*, 352 S.W.3d at 20. A child's emotional and physical interests must not be sacrificed in order to preserve the parent–child relationship. *Id.* When a parent's interests conflict with the child's, the child's best interest prevails. *Id.* at 21. Thus, although Father's parental rights are a compelling private interest, Rachel's competing private interest favors proceeding to trial despite Father's incompetency. *See id.*

#### b. Government Interests

The Texas Family Code tasks the Department with providing "a safe, stable, and nonviolent environment for the child." Tex. Fam. Code Ann. § 153.001(a)(2). It also tasks the Department with resolving termination and conservatorship issues within a fixed time. *See* Tex. Fam. Code Ann. § 263.401. The Department thus has an interest in a final decision that is not "unduly prolonged." *M.S.*, 115 S.W.3d at 548;

13

*R.M.T.*, 352 S.W.3d at 22. But the Department's interests in economy and efficiency are subordinate to the private interests at stake and to the risk of erroneously terminating the parent–child relationship. *M.S.*, 115 S.W.3d at 548; *R.M.T.*, 352 S.W.3d at 22.

Father filed a motion for continuance on the same day that the case proceeded to trial—July 18. The dismissal date was August 22. Father presented no evidence that another trial date was available before the dismissal deadline. Similarly, Father presented no evidence that he could be treated and regain competency before the dismissal date.

Because Father had already received one dismissal extension in February, the Texas Family Code did not allow for further extensions. *See* Tex. Fam. Code Ann. § 263.401(b). A dismissal is self-executing and does not depend on a party's filing a motion or the court's taking any action. *See id.* § 263.401(a). When circumstances force the Department to choose between (1) proceeding to trial while the parent is incompetent and (2) dismissing the case, its interest is "urgent." *R.M.T.*, 352 S.W.3d at 22.

### c. Risk of Erroneous Deprivation

And the procedures used—at least in Father's case—posed no risk of an erroneous deprivation of parental rights. Here, Father had a trial and had an attorney representing his interests. The trial court arranged to have Father transported to the trial, but Father refused the transport. During the trial, Father's attorney cross-

14

examined the Department's and the intervenor's (Paternal Uncle's) witnesses and presented evidence on Father's behalf.

Assuming that Father had attended the trial and had been competent at the time of trial, because his criminal proceedings remained pending, he likely would have asserted his Fifth Amendment right not to testify regarding Mother's death—which was precisely what he did when he testified at the hearing on his motion for new trial. And even if we were to ignore the criminal proceedings, Father's mental health remained an issue. The psychologist who determined that Father was incompetent to stand trial also concluded that he had a severe mental illness with "symptoms of a thought disorder, hallucinations, delusions, as well as . . . anger and hostility."

We hold that Father's due-process rights were not violated when the trial court proceeded to trial despite Father's incompetency. *See Mathews*, 424 U.S. at 335, 96 S. Ct. at 903; *R.M.T.*, 352 S.W.3d at 26. We overrule Father's first issue.

## B. Motion for Continuance

In Father's second issue, he contends that the trial court erred by denying his motion for continuance. Father's second issue depends largely on his first issue and fails for the same reason.

### 1. Background

As noted earlier, in February 2022, the trial court extended the dismissal deadline to August 22, 2022, and set Father's termination case for trial on July 18, 2022.

At a July 8 docket call, Father indicated that he intended to file a motion for continuance and orally asked for more time. The trial court denied Father's oral motion. Oral motions for continuance fail to preserve error. *In re C.F.*, 565 S.W.3d 832, 844 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). We thus do not further address Father's July 8 oral motion.

But on July 18, 2022—the day of trial—Father filed a written motion for continuance. After an evidentiary hearing, the trial court denied Father's motion and proceeded to trial without him.

### 2. Standard of Review

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *J.P.-L.*, 592 S.W.3d at 575. A trial court abuses its discretion if it acts without reference to any guiding rules or principles or, articulated differently, if it acts arbitrarily or unreasonably. *Id.* Merely because we would have ruled differently in the same circumstances does not establish that a trial court abused its discretion. *Id.*

### 3. Discussion

Father based his motion for continuance on his incompetency. Texas courts have recognized that "there is no Texas authority which would permit a trial court to halt termination proceedings due to the incompetency of the parent." *R.M.T.*, 352 S.W.3d at 18; *see E.L.T.*, 93 S.W.3d at 375 ("[A]ppellant fails to cite any authority in which a family court proceeding may be halted because of a parent's incompetency."). A parent's absence or incompetency does not entitle that parent to a

16

continuance. *See J.P.-L.*, 592 S.W.3d at 575. We thus hold that the trial court did not abuse its discretion by denying Father's motion for continuance and overrule Father's second issue. *See id.*

## C. Motion for New Trial

In Father's third issue, he argues that the trial court erred by denying his motion for new trial. Father attended the hearing on his motion for new trial and testified on his own behalf.

### 1. Standard of Review

We will not disturb a trial court's ruling denying a motion for new trial on appeal absent a showing that it abused its discretion. *In re R.F.*, No. 02-18-00090-CV, 2019 WL 2454863, at *4 (Tex. App.—Fort Worth June 13, 2019, no pet.) (mem. op.). A trial court abuses its discretion if it acts without reference to any guiding rules or principles or acts arbitrarily or unreasonably. *Id.*

### 2. The Hearing on Father's Motion for New Trial

#### a. Father Now Medicated

Father explained at his September 1 hearing on his new-trial motion that he was on a psychotropic medication, Haldol, and that he had received his first Haldol shot about three weeks earlier (around August 11 or over three weeks after his July 18 trial). The shots were monthly, so he was supposed to get another shot in about a week. Before that, Father maintained that he had not received any psychotropic medications, which meant that he was not medicated until after the termination trial.

17

### b. Father's Faulty Memory

Father testified that he had been in Denton County jail since the Department had removed Rachel. He maintained that "right now" was when he first learned that his parental rights had been terminated. He did not remember jail-transport officers coming to his cell on the day of the termination trial and asking him whether he wanted to be transported to the trial.

### c. Father Pleads the Fifth

Father acknowledged that he had been charged with murdering Mother, but he denied murdering her. Beyond that, he asserted his Fifth Amendment right not to have to testify against himself.

### d. Whether the Result Would Be Different

Now that he had received medication, he believed that he would be able to appear for trial, and if given a new trial, he intended to work with his attorney and present evidence at the trial. The outcome, he said, would be different. If he had been allowed to participate in the earlier trial, he believed that his parental rights might not have been terminated.

Father and Rachel's attorney ad litem engaged in the following exchange regarding what would be different if the trial court granted him a new trial:

A. Well, I'm here, and I'm competent, and I show that I love my daughter.

Q. And you think that is enough in this case?

A. I believe that is a good start.

**e. Whether Father had Refused Medication**

Father denied having been offered any psychotropic medications before the termination trial. Testimony and evidence from earlier proceedings, however, showed the contrary: that Father had been offered but had refused any medications.

For example, when the Department asked Shelton at trial if Father had been offered any medications in jail, he responded,

> I don't deal on the medical side, but our medical department does have a med cart that they go around. They will knock on the door and ask if they want their medication. It's then up to that inmate whether they choose to take that medication or not.
>
> [The Department] Q. To your knowledge, does [Father] choose to take his medication?
>
> A. I do not believe so.

And during the July 18 hearing on Father's motion for continuance, the trial court referred to a report from David Jahn—the attorney appointed in the probate court to determine whether Father should be appointed a guardian—in which Jahn asserted that Father had been prescribed medication but had refused to take it. The trial court made Jahn's report part of the record.

In Jahn's report, he wrote, "While in custody [Father] has been seen by Dr. Shupe on six different occasions for psychiatric services during his incarceration since March 5, 2021. Dr. Shupe has prescribed psychoactive medications, but [Father] has refused to take the prescribed medications." Jahn also explained how the Denton

County jail's medical staff would not force medications on inmates. At the July 8 docket call, Jahn represented to the trial court that the Denton County Health Department Jail Medical Division's policy was not to force medications on inmates.

At the hearing on Father's motion for new trial, the Department argued that trial testimony showed that Father had been offered medication but had refused to take it and that Father took the medication only after he was court-ordered to do so. At the hearing, Father acknowledged that the shot he had received was a result of a court order.

### 3. Discussion

Father's testimony confirmed that his presence during the trial would not have made a difference. Trial testimony already showed that Father loved Rachel and that he had acted on the perception that Rachel was in danger and needed protection.[4] Because Father's criminal case was still pending, he likely would not provide any additional insight into Mother's death but would, instead, invoke his Fifth

___

[4]At the July 8 docket call, Rachel's attorney ad litem succinctly articulated her position:

> She definitely wants some stability and wants to be adopted. But she also asks every time I talk to her how her father is, if he needs anything, if there's something she can provide for him.
>
> And up until a week or so ago when I talked with Mr. Jahn, I didn't have any ideas of the extent of [Father's] deterioration. And that would break [Rachel's] heart as well. I think -- I appreciate your ruling on this case because I think she does need stability, and I am grateful that we're going forward.

Amendment right not to testify, just as he did at the hearing on his new-trial motion. Regarding Father's mental health, a psychologist, not Father, was the best witness to provide insight into Father's prospects for obtaining and maintaining mental health. Finally, Father's presence would not have changed anything regarding his inability to parent Rachel while his murder charge remained pending or, potentially, after it was resolved.

We hold that the trial court did not abuse its discretion by denying Father's motion for new trial and overrule his third issue. *See id.*

## V. Conclusion

Having overruled Father's three issues, we affirm the trial court's judgment.


/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  December 15, 2022

21